**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Deborah D. Anderson,                                    Civil No. 06-CV-4270 (ADM/FLN)

        Plaintiff,

v.                                                **REPORT AND RECOMMENDATION**

Michael J. Astrue
Commissioner of Social Security,

        Defendant.

_____

     Defendant has denied Plaintiff Deborah Anderson's application for disability insurance

benefits (DIB) under the Social Security Act, 42 U.S.C. § 423.  Plaintiff filed a complaint

seeking review of the denial of benefits on October 24, 2006.  The action is now before the Court

on cross-motions for summary judgment.  Plaintiff is represented by Sean M. Quinn, Esq.

Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.  This Court has

jurisdiction of the matter pursuant to 42 U.S.C. § 405(g), and it is properly before the United

States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure

72(b).   For reasons stated in the following discussion, the Court recommends denying Plaintiff's

motion for summary judgment [No. 10]; and granting Defendant's motion for summary

judgment [Docket No. 18].

**I.      PLAINTIFF'S BACKGROUND**

     Plaintiff Deborah Anderson was forty-eight years old on the alleged onset date.  (Tr.

925).  She has a high school education and past relevant work as a human service technician,

1

waitress, and cook.  (Tr. 17).  She is divorced and lives alone.  She has three adult children.  (Tr. 929).  Plaintiff alleges her disability began in April 2001, and was caused by an incident where a client in the group home where she worked assaulted her in December 1999.  (Tr. 926).  Plaintiff alleges she is disabled by post traumatic stress disorder, memory loss, pain in the knee, ankle and shoulder, sinus trouble, and migraines.  (Tr. 127).

## II.     MEDICAL RECORDS PRIOR TO ONSET DATE

On December 10, 1999, Plaintiff was brought to St. Luke's Hospital, where she reported being pushed by a client at a group home and striking the right side of her face.  (Tr. 268).  She reported feeling dizzy at first, but said she felt much better upon examination.  She did not have neck tenderness and was able to move her neck without any difficulty.  (Tr. 268).  Her injury and treatment were described as follows:

> She has a 3 cm laceration just tangentially through the lateral corner of her right eyebrow that is superficial.
>
> The wound was infiltrated with 1% buffered lidocaine, cleaned with saline and Betadine in routine fashion and then closed with 6-0 Ethilon sutures...The patient was discharged with routine wound care instructions.  Stitches out in 5 days.

(Tr. 268).

Several days later, Plaintiff was examined by her primary care physician, Dr. Christensen.  (Tr. 525).  She described the incident at the group home.  She said a client gave her a quick shove, totally unexpected, and she went down on her right side.  She later developed "a lot of pain along the right side of the head, the right neck, the right shoulder, the right chest, and hip."  (Tr. 525).  Her reflexes and strength were normal, but her neck range of motion was limited.  There was tenderness in her neck.  Her pain level on the right side was the same a week

2

later when she had the sutures removed.  (Tr. 524).

Plaintiff was referred to physical therapy by Dr. Christensen in December 1999.  (Tr. 291).  When she described the work related injury to the physical therapist, she said she fell on her right shoulder and had instant pain.  (Tr. 292).  She was not working at the time of examination, and she was apprehensive about going back to work.  (Tr. 291).

On December 31, 1999, Dr. Christensen noted Plaintiff was much better since he saw her a week ago.  (Tr. 521).  He believed she could return to work with certain restrictions.  (Tr. 521).

On January 18, 2000, Plaintiff noted improvement of her shoulder pain with physical therapy.  (Tr. 290).  She stated, "I barely notice that it hurts."  Plaintiff was seen in urgent care on February 1, 2000.  (Tr. 341).  She had been back working for three weeks, and she reported injuring herself by spending time at a computer terminal.  She was diagnosed with right trapezius strain/spasm/pain.  She was prescribed Flexeril, Lortab, and Ibuprofen.  (Tr. 341).

After months of conservative treatment, Plaintiff continued to complain of pain in the shoulder.  Dr. Christensen ordered an MRI.  (Tr. 517).  The impression from the MRI was a "[v]ery small joint effusion..."[1]  (Tr. 330).  Dr. Christensen continued Plaintiff on light duty work.  (Tr. 516).

Shortly thereafter, he referred Plaintiff to an orthopaedic specialist, Dr. Carlson, to determine if they should go beyond conservative treatment.  (Tr. 515).  Plaintiff told Dr. Carlson that she had severe pain in the right shoulder, especially when she reaches.  (Tr. 623).  She said she was not improving significantly.  She had marked tenderness with active and passive range of motion.  (Tr. 623).  But the next day, Plaintiff reported decreasing pain and the ability to do

---

[1]  Effusion is a collection of fluid.  Stedman's Medical Dictionary 570 (27th ed. 2000).

more activities at home.  (Tr. 287).  Several weeks later, she reported having very little pain.

(Tr. 286).  Dr. Christensen noted Plaintiff was doing better, and she asked to go back to full

unrestricted work.  (Tr. 514).

Plaintiff underwent right shoulder arthroscopy on May 24, 2000.  (Tr. 284).  The next

month, she reported her shoulder was about the same as before surgery.  (Tr. 280).  Her right

shoulder throbbed at night, making it very difficult to sleep.  However, in physical therapy on

July 5, 2000, she reported her pain was much better.  (Tr. 278).

Plaintiff discussed the possibility of increased stress causing an increase in pain.  She

admitted being under stress at home.  (Tr. 278).  Her physical therapist wrote,  "[t]errible pain is

associated [with] nervousness or tension - so able to minimize [with] conscious effort."  (Tr.

277).  In August 2000, it was noted that Plaintiff continued to improve, but her pain fluctuates

with activity, weather, and her emotions.  (Tr. 275).

In physical therapy in September 2000, Plaintiff reported her pain was about 25% better

than before the surgery.  (Tr. 274).  However, she rated her pain an eight on a scale of ten.  She

takes Ibuprofen during the day and Tylenol at night.  Later that month, Plaintiff reported her arm

was feeling much better.  (Tr. 272).

Plaintiff reported significant difficulties to Dr. Christensen in October.  (Tr. 511).  She

continued to have right shoulder pain.  She had migraines localized in the area near where her

laceration had been.  She was tired, depressed, having violent nightmares, and panic attacks.

(Tr. 511-12).  Dr. Christensen noted Plaintiff was scared of going back to work.  He diagnosed

"apparent post traumatic stress syndrome."  (Tr. 511).  He prescribed Zoloft, and recommended

that Plaintiff see a specialist for stress related problems.

4

On October 31, 2000, Plaintiff underwent a diagnostic assessment with Joan Heimsness, a clinical social worker.  (Tr. 362-65).  Ms. Heimsness planned to provide Plaintiff with individual therapy for post-traumatic stress disorder, depression, anxiety, and panic attacks.  (Tr. 362).

In early November 2000, Plaintiff was reportedly feeling much better after her employer offered her a part-time position in the human resources office.  (Tr. 361).  She was able to sleep without nightmares.  The following week, her mood was improved, but physically she was suffering from headaches and sinus problems.  (Tr. 359).  She experienced some panic while driving, but she was able to talk herself through it.

At the end of the month, Plaintiff was feeling better after her first day of work in an office environment.  (Tr. 358).  Her spirits were up.  Her memory was better.  Her dreams were less traumatic, and she was able to fall asleep again after waking up at night.  (Tr. 358).  In December, Plaintiff continued to report improvement and satisfaction with her new job.  (Tr. 357).  Dr. Christensen imposed the following work restrictions:  "avoid repetitive use of right upper extremity, no prolonged overhead work, no lifting greater than 20 lbs."  (Tr. 505).

Plaintiff reported having headaches in January 2001.  (Tr. 356, 504).  She was enjoying her work, but she experienced some panic attacks when her employer began talking with her about going back to work in a group home setting.  (Tr. 356).  Dr. Christensen supported a plan for Plaintiff to go back to work in a different group home.  (Tr. 503).

In February 2001, Plaintiff reported work going well.  She "is eating healthy and enjoying her life."  (Tr. 353).  Her nightmares were reduced considerably.  (Tr. 353).

On February 24, 2001, Plaintiff was seen in an emergency room for panic related chest

tightness and migraines. (Tr. 340). She was prescribed Ativan. (Tr. 340). She saw Dr. Christensen several days later, and told him things were not going well between her and her new supervisor. Plaintiff appeared anxious, nervous, upset, and worried. Her migraines were returning. Dr. Christensen stated Plaintiff needed to be in a gentle environment in order to get back to work. (Tr. 502).

In March, Plaintiff reported being afraid to return to work due to stress from her immediate supervisor. (Tr. 500). Dr. Christensen stated, "It seems to me that a lot of the problems in this return to work have come from her supervisory people and were needless and unnecessary in making our return to work attempts very difficult." (Tr. 500).

A week later Dr. Christensen noted:

> [t]he panic is a tight voice, difficulty speaking. She is having difficulty controlling her bladder, some hyperventilation, memory loss, unexplained pains, inability to cope, difficulty with supervisors and work environment. She is also withdrawing from society and trying to stay at home and becoming more agoraphobic.

(Tr. 499). He recommended intensive psychological therapy.

Later that month, Plaintiff reported pain in the neck, headaches, panic attacks, and problems with her bladder. (Tr .495). Dr. Christensen noted, "[s]he also has diarrhea, especially the last 2-4 weeks that she has been working through the stress of trying to get back to work and she is panicking." (Tr. 495).

Plaintiff was evaluated by Dr. Brian Erickson at Miller Dwan Medical Center on March 27, 2001. (Tr. 372-73). Plaintiff described being physically assaulted by a client more than one year ago. She reported it was a significant assault, which ended when she "laid still, pretending to be dead." (Tr. 372.) Plaintiff's thought content indicated decreased memory and

concentration, disorientation, some paranoia, and pressured speech.  (Tr. 384).  She was isolated

due to fear of going out.  (Tr. 385).

## III.   MEDICAL RECORDS AFTER ONSET DATE

Plaintiff was admitted for partial hospital treatment at Miller Dwan Medical Center on

referral from her therapist.  (Tr. 371).  Her admitting diagnosis was post traumatic stress

disorder.  Plaintiff's clinical course and final assessment after completing the hospital program

were described as follows:

> CLINICAL COURSE:  Deborah participated in nine days of
> partial hospital care from April 9, 2001 to May 4, 2001.  Upon
> admission, she displayed pressured speech.  She talked of multiple
> stressors and related to her being physically assaulted at work.  She
> complains of flashbacks and nightmares.  She had concerns
> regarding her fibromyalgia and chronic pain.  She talked about her
> emotional abuse issues resulting from her childhood and her eating
> disorder, currently in remission...
>
> FINAL ASSESSMENT:  At time of discharge Deborah reported
> feeling much better.  She felt she had improved her self-esteem
> and assertiveness skills.  She felt optimistic about the future and
> displayed clear thinking and reduced anxiety.  She also was able to
> manage her panic much more effectively...

(Tr. 371).  Her discharge diagnosis was post traumatic stress disorder, in partial remission.  Her

medications were Zoloft, Ativan, and Zanaflex.  (Tr. 371).

In May 2001, Dr. Carlson, an orthopaedic specialist, noted that Plaintiff had full motion

but significant tenderness in her right shoulder.  (Tr. 366, 620).  He did not feel surgery was

appropriate, but he recommended a thirty-day trial with a TENS unit.  If that did not help, he

would recommend a pain clinic.  (Tr. 366, 620).

On June 6, 2001, Dr. Christensen responded to a letter from the attorney who was

assisting Plaintiff with her workers' compensation lawsuit.  (Tr. 400-04).  Dr. Christensen stated

7

that Plaintiff suffers from depression and anxiety with post traumatic stress disorder, myofascial trigger points with continuous headaches, and previous injury of the right shoulder with continued pain, limited range of motion, and weakness.  (Tr. 401).  He opined that she was disabled as of February 24, 2001.  Dr. Christensen noted that when Plaintiff last worked she had panic attacks, headaches, and hyperventilation, which necessitated her removal from that environment.  (Tr. 401).  He noted, "[h]er QRC [rehabilitation consultant] is currently working for some type of a lateral work arrangement that she might be able to fit into."  (Tr. 401).

In response to a request from Plaintiff's workers' compensation attorney, Dr. Randall Lakosky conducted a psychiatric evaluation of Plaintiff in July 2001.  (Tr. 463).  He diagnosed post traumatic stress disorder, generalized anxiety disorder, and depression.  He stated, "[t]he PTSD is severe and would classify as a moderate emotional disturbance or 40% disability."  (Tr. 464).

At the request of the attorney for the State of Minnesota, in relation to Plaintiff's workers' compensation lawsuit, Dr. Gratzer performed an independent psychiatric evaluation of Plaintiff.  (Tr. 405-462).  The purpose of the evaluation was to determine what emotional injuries, if any, stemmed from Plaintiff's injury in December 1999.  (Tr. 405).  He conducted an extensive review of Plaintiff's medical records from prior to and after the work related injury.  (Tr. 407-434).

Dr. Gratzer also reviewed the results of the MMPI-2, which was administered to Plaintiff earlier.  (Tr. 434).  The clinical scale pattern indicated an extreme number of physical complaints and problems with anxiety, shyness, and social withdrawal.  (Tr. 434).

Interpretation of the MMPI-2 results revealed that Plaintiff was prone to development of

physical complaints under stress, and her physical complaints are probably due to emotional problems.  (Tr. 434).  "Her somatic complaints are likely to be vague, grossly exaggerated and poorly correlated with the actual physical findings."  (Tr. 434).

Dr. Gratzer diagnosed the following:  somatoform disorder; eating disorder; generalized anxiety disorder with panic attacks; dysthymia; histrionic personality disorder with dependent, compulsive, and avoidant features.  (Tr. 438-39).  Dr. Gratzer opined that Plaintiff has a preexisting condition of histrionic personality disorder, which has its etiology in her dysfunctional and abusive childhood.  (Tr. 439).  He noted a longstanding history of anxiety and depressive symptoms.  (Tr. 439).

Dr. Gratzer did not believe the worsening of Plaintiff's symptoms of generalized anxiety disorder were related to her injury in December 1999.  (Tr. 440).  He noted her anxiety symptoms were attributed to difficulties in the relationship with her supervisor in January 2001.  (Tr. 440).  He opined Plaintiff's fears of returning to work were the result of characterological issues separate from a psychiatric condition which would disable her from work.  (Tr. 441).

At the request of Plaintiff's attorney, Dr. Lakosky reviewed Plaintiff's MMPI-2 results. He noted the profile validity results indicated the profile was unlikely to provide much useful information.  (Tr. 617-18).  He added that an MMPI-2 cannot diagnose post traumatic stress disorder "which is her main problem."  (Tr. 618).

In July 2001, Dr. Christensen opined Plaintiff "continues [to be] totally disabled because of post traumatic stress syndrome and disorder."  (Tr. 488).  He noted Plaintiff has headaches two to three times a week.  (Tr. 488).  However, the TENS unit was helping her headaches quite a bit. (Tr. 488).  Dr. Carlson also noted that the TENS unit gave Plaintiff excellent relief from

shoulder pain.  (Tr. 619).

At the request of the attorney for the State of Minnesota, Plaintiff underwent an independent medical evaluation related to her physical complaints.  (Tr. 471).  Dr. Larry Stern reviewed Plaintiff's medical records, interviewed her, and examined her.  (Tr. 471-76).  Upon examination, Plaintiff had "subjective loss of motion," in that she did not want to extend beyond certain points.  (Tr. 473).  She complained of mild pain on palpation.  Dr. Stern concluded that Plaintiff has right shoulder myofascitis, and a history of right shoulder debridement and subacromial decompression.  (Tr. 475).

In October 2001, Plaintiff was suffering from panic.  (Tr. 482).  She had difficulty going into crowds.  Upon examination, she complained of a right frontal headache "where she was hit before."  (Tr. 482).  Plaintiff's right arm was getting better.  (Tr. 482).  Dr. Christensen released Plaintiff for employment on a work hardening basis.  (Tr. 483).

Plaintiff saw Dr. Christensen, accompanied by her QRC, in November 2001.  (Tr. 479).  She continued work with physical restrictions, but not in a group home.  (Tr. 479).  Dr. Christensen said, "she is perfectly able to do any lateral work that the state should be able to provide within those restrictions..."  (Tr. 479).

Plaintiff returned to Gateway Family Health Clinic in February 2002.  (Tr. 477).  Plaintiff had been doing quite well since they last saw her.  She was in the process of getting into school.  (Tr. 477).  The reason for her visit was burning and reflux in her chest.  Examination was basically normal.  (Tr. 477-78).

When Plaintiff saw Dr. Carlson on February 18, 2002, she reported severe pain in her shoulder.  (Tr. 619).  She said the TENS unit helped "a little bit."  Upon examination, she had

passive full range of motion with pain and tenderness.  Dr. Carlson contacted Plaintiff's QRC and stated she could not return to heavy work.  He recommended that she be considered for sedentary work.  (Tr. 619).

Later that month, Plaintiff had an upper endoscopy to diagnose symptoms of gastroesophageal reflux disease.  (Tr. 715).  The test revealed a moderate sized hiatal hernia.

Plaintiff had an EMG test on her right shoulder.  (Tr. 565-68).  The test results were unremarkable except for findings of mild grade carpal tunnel syndrome.  She also had an MRI of her neck in May 2002.  (Tr. 712, 721).  There was a small disc protrusion on the left side and degenerative changes.  Dr. Christensen noted the findings were not in the area that was giving Plaintiff trouble.  (Tr. 712, 721).

In April 2002, Dr. Christensen noted that Plaintiff was "doing quite excellent."  (Tr. 796).  She had quit smoking, and she was very happy with herself.  (Tr. 795).

In July, Joan Heimsness responded to a letter from Plaintiff's attorney in relation to Plaintiff's workers' compensation litigation.  (Tr. 611-12).  Her diagnosis of Plaintiff was post traumatic stress disorder in partial remission and anxiety disorder with panic symptoms.  (Tr. 611).  She said "[w]hen I first saw Deborah on October 31, 2000, it was very clear she was suffering from PTSD."  (Tr. 611).  Ms. Heimsness did not offer an opinion on disability.  (Tr. 612).

The next month, Plaintiff complained of fatigue.  (Tr. 787).  She was otherwise "feeling great."  (Tr. 787).  She questioned whether Ativan caused the fatigue.

In October 2002, Ms. Heimsness treated Plaintiff in individual therapy.  (Tr. 689).  Plaintiff reported having difficulty in a computer class.  This triggered scary dreams, panic, and

anxiety.  Plaintiff also stated that contact with her mother was stressful at times.  In November, Plaintiff quit her computer class.  She was having panic attacks and spending a lot of time sleeping.  (Tr. 682).  She went back on Zoloft, but continued to be miserable.  (Tr. 682, 677). She had diarrhea, pain, panic, and difficulty sleeping.  She said she was petrified about going to work.  (Tr. 677).  Ms. Heimsness noted Plaintiff was up for review by workers'compensation.

In November 2002, Dr. Carlson examined Plaintiff for pain in the right knee.  (Tr. 626). Examination was normal.  X-rays showed only mild degenerative changes.  Plaintiff had an MRI, which did not exclude the possibility of a small tear of the meniscus.  (Tr. 720).

When Plaintiff met with Ms. Heimsness, she reported being "physically a wreck."  (Tr. 674).  She had been diagnosed with irritable bowel syndrome, diverticulitis, and had three polyps removed since she last went to individual therapy.  (Tr. 674 and 723-25, 777-79).

Plaintiff was referred for a psychological evaluation for assessment of memory problems. (Tr. 653).  Plaintiff reported a dramatic decline in memory over the past six months.  (Tr. 653). She described moments of disorientation, and one to five minute periods where her mind goes blank.  She stated that she drops things frequently, her ears were ringing, and she had difficulty understanding things.  She discontinued a computer class because she could not understand the instructor.  Plaintiff was especially concerned about her problems because her mother was recently diagnosed with dementia.  (Tr. 653).

Dr. Allaird and Dr. Niemi administered and interpreted Plaintiff's test results of the following personality, intelligence, and memory tests:  MMPI-2, MCMI-III, WAIS-III, WMS-3, and Multidimensional Pain Inventory.  (Tr. 653-54).  Test results indicated Plaintiff's intelligence was in the average range.  (Tr. 658).  With respect to memory, her performance on

immediate and delayed auditory tasks was below the level predicted for someone of her

intellectual functioning.  (Tr. 658).

The MMPI-2 produced a valid profile.  The profile was of a person who is preoccupied

with physical problems.  (Tr. 659).  People of similar profiles tend to respond to tension with

physical complaints.  "They may tend to magnify the severity of their physical problems."  (Tr.

659).  They experience depression, low energy, and concentration difficulties.

Plaintiff endorsed a high pain severity on the Multidimensional Pain Inventory.  (Tr.

659).  However, her responses also indicated her pain causes little emotional suffering and

interferes little in her daily activities.

Plaintiff described her relationship with her parents growing up as "good/normal."  (Tr.

654).  She denied conflict with coworkers, supervisors, or clients.  (Tr. 655).  She complained of

various body pain at a level of five out of ten on average.

Plaintiff explained that she drank three pots of caffeinated coffee a day and up to twelve

cans of caffeinated pop.  (Tr. 655).  This made her hyper, then fatigued.

Dr. Allaird diagnosed the following:  anxiety disorder; pain disorder; post traumatic

stress disorder, chronic, per history; amphetamine abuse, in sustained full remission by client's

report.  (Tr. 659-60).  He indicated a GAF of 45.  (Tr. 660).  The assessment data was

insufficient to explain the cause and anticipated course of Plaintiff's memory problems.  (Tr.

661).  Therefore, a neuropsychological evaluation was recommended.  Dr. Allaird also suggested

that Plaintiff seek medical advice regarding the possible association between her use of caffeine

and her medical and physical problems.

In March 2003, Plaintiff reported that her irritable bladder had improved with taking

Detrol. (Tr. 772). Zoloft was helping her depression. However, caring for her mother, and the recent death of her stepfather was affecting her mood. (Tr. 773).

Upon request of the SSA, Joan Heimsness completed a psychological medical report. (Tr. 649-51). She opined Plaintiff would need work with minimal stress. (Tr. 651).

In June 2003, Plaintiff complained of chronic sinus pressure. (Tr. 768). Plaintiff's MRI results confirmed acute and chronic sinusitis. (Tr. 769). After further testing, she was diagnosed with moderate obstructive disease. (Tr. 766). She found some improvement with the use of an Albuterol nebulizer.

In August 2003, Plaintiff reported feeling emotionally stable. (Tr. 731). Her mother had moved into supervised living. Plaintiff was keeping busy by cleaning out her mother's house with her sister.

Plaintiff underwent a neuropsychological evaluation with Dr. Gregory Murrey. (Tr. 737-42). Plaintiff's intellectual functioning was within the average range. (Tr. 741). She performed average or better on neuropsychological memory tests, with the exception of short-term auditory and delayed auditory memory, which was in the low-average range. Dr. Murrey noted that Plaintiff also reported a high level of depressive symptoms, anxiety symptoms, and somatic complaints. (Tr. 741). He opined that if these improved or resolved, Plaintiff's short-term memory and processing speed would also likely improve.

Upon reviewing the neuropsychological evaluation, Dr. Camenga, a neurologist who saw Plaintiff on two prior occasions,[2] opined that Plaintiff could not return to work at the present

_____

[2] Dr. Camenga saw Plaintiff in relation to her migraines and memory loss. He reviewed an MRI of her brain, which was normal. (Tr. 747-50, 754). Plaintiff stated her headaches were down to once a week after eliminating caffeine. Dr. Camenga prescribed Depakote to reduce the

time.  (Tr. 744).  His opinion was based on the diagnosis of PTSD and prolonged depressive reaction.  In a letter to Plaintiff's attorney, he stated:  "...I do not think she would ever be able to work full-time without missing a significant amount of work due to pain, migraine headaches and post traumatic stress disorder."  (Tr. 756).

Plaintiff was treated at Gateway Family Health Clinic in January 2004.  (Tr. 761).  She complained of exhaustion, pain, and IBS.  (Tr.  762).  She was given Elavil to help with fibromyalgia pain.  (Tr. 763).  Several weeks later, she said she was sleeping better and her muscles were less tender.  (Tr. 761).  She had tenderness on several trigger points upon examination.

In April 2004, Dr. Dewey responded to a letter from Plaintiff's attorney.  (Tr. 831).  He opined that Plaintiff is totally and permanently disabled from any occupation due to chronic pain, fibromyalgia, post traumatic stress disorder, and panic disorder with a significant component of depression.  (Tr. 831-32).

Plaintiff underwent a consultative psychological examination with Dr. Lyle Wagner in August 2004.  (Tr. 847-52).  Dr. Wagner diagnosed the following:  depressive disorder; panic disorder with agoraphobia; post traumatic stress disorder by history.  (Tr. 851-52).  He assigned Plaintiff a GAF score of 48-52.[3]  He found her ability to concentrate on and understand instruction is moderately impaired.  (Tr. 850).  Her ability to persist at a reasonable pace is

---

frequency and severity of her headaches.

[3]  A Global Assessment of Functioning "GAF" score of 41-50 indicates serious symptoms.  A GAF score of 51-60 indicates moderate symptoms.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders Fourth Edition Text Revision 34 (2000)(DSM-IV-TR).

moderately to markedly impaired.  This would fluctuate according to her level of panic, anxiety, and depression on a particular day.  By self-report, her ability to tolerate coworkers', the public, and handle supervision, is excellent.  (Tr. 850).  Her ability to handle stress and pressure in the work setting is mildly to markedly impaired.  (Tr. 851).  This would also fluctuate with her level of depression, and if she had a panic attack on a particular day.

In February 2005, Dr. Lakosky provided an update on Plaintiff's condition in response to a letter from Plaintiff's attorney.  (Tr. 826-27).  He concluded Plaintiff remained disabled for any occupation.  (Tr. 826).  He explained:  "She has had no improvement with her panic disorder or generalized anxiety disorder.  Overall, I think the best full diagnosis would be a Posttraumatic Stress Disorder."  (Tr. 826).

The SSA requested the professional opinion of Dr. Paul Gannon, and asked that he complete interrogatories concerning Plaintiff.  (Tr. 876).  Dr. Gannon noted that he is a thoracic and cardiovascular surgeon.  (Tr. 874).  He reviewed Plaintiff's medical records and concluded:

> The medical record supports the claimant's impairments 12.06
> anxiety related disorder and 12.02 organic mental disorder in
> combination of equaling the listing for 12.06.  The record does not
> support meeting any of the other listings I recorded above.
> ...
> Exertional limitations light IE occasionally lift 20lb, frequently
> 10lb, stand/walk 6/8 hrs sit 6/8 hrs but to avoid any work involving
> association with mentally/physically disabled persons similar to
> previous occupation IE light.

(Tr. 875).

## IV.    NEW MEDICAL RECORDS SUBMITTED TO APPEALS COUNCIL

Dr. Paul Dewey completed a "Report on Continuation of Total and Permanent Disability" on Plaintiff's behalf on March 27, 2006.  (Tr. 880).  He concluded Plaintiff continued to be

totally and permanently disabled "due to previous head injury/assault and subsequent PTSD, depression, and r[ight] shoulder pain." (Tr. 880).

V.      **PROCEDURAL BACKGROUND**

   A.  <u>**Administrative Process**</u>

Plaintiff filed multiple applications for social security disability benefits, but the application at issue is dated October 22, 2003. (Tr. 94-96). The application was denied initially and upon reconsideration. (Tr. 27-29, 30-32). Plaintiff requested a hearing before an Administrative Law Judge. (Tr. 12). A hearing was held before Administrative Law Judge Roger Thomas on December 8, 2005. (Tr. 922). On March 24, 2006, the ALJ issued an unfavorable decision. (Tr. 13). The Social Security Administration Appeals Council denied a request for further review. (Tr. 8-11). The denial of review made the ALJ's findings the final decision of the defendant. 42 U.S.C. § 405(g); <u>Browning v. Sullivan</u>, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981.

   B.  <u>**Hearing before the Administrative Law Judge**</u>

At the hearing before ALJ Roger Thomas, Plaintiff testified that her disability began after she was attacked by a client in a group home, and she subsequently found herself unable to return to work due to physical and psychological injury. (Tr. 926). She suffered emotional trauma, including flashbacks. (Tr. 926). She also developed shoulder pain, which led to surgery. <u>Id.</u> She attributed her present emotionally stability to staying at home among her inner circle of friends and family.

Plaintiff testified she can drive around town. (Tr. 930). She is able to walk a block, but there are times when her knees go out. (Tr. 931). She can care for herself in her own home. She

can do a little flower gardening.  (Tr. 944).  One of her daughters lives next door to her, and

helps her with heavy cleaning.  (Tr. 932).

Plaintiff had surgery on her right shoulder in the year 2000.  (Tr. 935-36).  She continues

to have right arm pain. (Tr. 932, 936).  She wears a brace for carpal tunnel syndrome.  (Tr. 933-

34).

Plaintiff described the incident that led to her injuries.  She was pushed by a client in a

group home, and hit her head on the side of a doorjamb.  (Tr. 937).  She ended up with

approximately twenty stitches in her head.  Several days later, she started to have pain in her

shoulder, head, and neck.  (Tr. 938-39).  After having shoulder surgery, she tried to go back to

work.  (Tr. 939).  She wasn't able to stay employed because she developed emotional problems

and continued to be in pain.  (Tr. 940-41).

Plaintiff testified she has irritable bowel syndrome with flare ups every day.  (Tr. 941-

42).  Her bladder has not been the same since she had bladder repair surgery.  (Tr. 942).  Her

knees give her trouble.  (Tr. 942).  She had surgery on her right knee in 1995.

Plaintiff has sinus trouble.  (Tr. 943).  She also testified that she has migraine headaches

that start in the eye where she was injured.  (Tr. 948).  She gets headaches twice a week and uses

Ativan to relieve her headaches.  (Tr. 949).

Plaintiff testified that she has had incidents where she was driving and had to stop

because she forgot where she was going.  (Tr. 948).  She testified that she gets along with other

people, but she is embarrassed when she forgets things.  (Tr. 951).

A medical expert, Dr. James Huber, testified at the hearing.  (Tr. 954).  He noted, based

on the record, that claimant has impairments of depressive disorder, anxiety disorder, and post

traumatic stress disorder.  (Tr. 955).  Dr. Huber testified that Plaintiff's activities of daily living

are mildly to moderately impaired.  (Tr. 957).  Her social functioning is moderately to markedly

impaired.  Her concentration, persistence, and pace vary from moderately to markedly impaired.

(Tr. 957).  Plaintiff had one episode of decompensation.  (Tr. 957).

Dr. Huber testified he does not believe Plaintiff meets or equals a listed impairment

because sometimes Plaintiff is moderately impaired, and sometimes she is markedly impaired.

(Tr. 957).  He could not find, in the record, a period lasting at least twelve months where

Plaintiff was markedly impaired.  (Tr. 957-58).

Dr. Huber testified that if Plaintiff were to work, he would restrict her to brief and

superficial contact with coworkers and supervisors, not in the general public, not in a

supervisory role, no high production demand, and work that doesn't have interpersonal type

stress. (Tr. 958).  He clarified that she can have coworkers, but she would have difficulties if

they were hostile.  He further clarified that her coworkers would have to be people she got along

with.  (Tr. 963).

A vocational expert, Edward Utities, testified at the hearing.  (Tr. 963).  He first

responded to a hypothetical question involving a forty-eight to fifty-three year-old woman, with

a high school education, with Plaintiff's past work experience, who has the psychological

impairments noted by Dr. Huber, and chronic obstructive pulmonary disease, headaches, pain in

the knees and right shoulder, both of which resulted in surgery, right carpal tunnel treated with a

splint, and sinus complaints.  (Tr. 966-67).  The hypothetical person was limited to a full range

of light work but with no work as a human services technician or that type of work.  (Tr. 967).

She is further limited to work with only brief and superficial contact with co-workers and no

public contact.  She shouldn't have work with a supervisory role, work with high production goals or work where there are interpersonal conflicts in the environment on a regular basis.  (Tr. 967).

The vocational expert testified that such a person could not perform any of Plaintiff's past work, but could perform other work in the regional or national economy, including carver, salad maker, pantry goods maker, and sandwich maker.  (Tr. 968-69).

The ALJ posed a second hypothetical question, which assumed a similar individual, who shouldn't kneel on the right knee, should not do over the shoulder work with the right upper extremity, should not do right hand power gripping, and should have ready access to a bathroom.  (Tr. 970).  The vocational expert testified such a person could perform the work he previously described.  He stated his testimony was consistent with the Dictionary of Occupational Titles "DOT."  (Tr. 970).

Plaintiff's counsel asked the vocational expert whether the kitchen related jobs, which he stated were consistent with the ALJ's first hypothetical, could be very busy at times.  (Tr. 971).  The VE agreed that such jobs could have times where a person was expected to produce at a higher level.

The ALJ then asked, assuming the jobs listed by the VE were precluded by the limitation from working in a high production environment, are there other jobs the hypothetical person could perform.  (Tr. 971-72).  The VE testified that such a person could perform other light, unskilled work such as bander and cellophaner, poly packer and heat sealer, and wrapping machine operator.  (Tr. 972-73).  These are "production type" jobs where you would normally expect to have a coworker within a ten to twelve foot range.  (Tr. 974).

### C.  **The ALJ's Decision**.

At step one of the disability evaluation, the ALJ found that the claimant has not engaged in substantial gainful activity since the alleged onset date, April 16, 2001.  20 C.F.R. § 404.1520(b).  (Tr. 17).  The ALJ continued to the second step of the evaluation and found that the claimant has severe impairments of chronic obstructive pulmonary disease, headaches, degenerative joint disease of the knees, status post 1995 surgery, status post right shoulder acromioplasty, status post cerebral trauma, sinus complaints, close out right hand carpal tunnel syndrome, post-traumatic stress disorder, depression, and panic disorder with agoraphobia.  (Tr. 17).  20 C.F.R. § 404.1520(c).

The third step in the evaluation process requires the ALJ to consider whether the claimant has an impairment or combination of impairments that meet or equal an impairment listed in Appendix 1, Subpart P of the regulations.  20 C.F.R. § 404.1525.  The ALJ found that claimant's impairments do not meet or equal one of the listed impairments.  (Tr. 18).

The ALJ determined the severity level of Plaintiff's mental impairments within the provisions of 20 C.F.R. § 404.1520(a).  He found that Plaintiff has mental impairments which cause mild limitations in activities of daily living, moderate limitations in social functioning, concentration, persistence and pace, and no episodes of decompensation.  (Tr. 19).  He made this determination of severity by taking into account variations in the level of functioning over time.

Step four requires the ALJ to first determine Plaintiff's residual functional capacity ("RFC") and then consider whether the claimant can still perform work she has done in the past. 20 C.F.R. § 404.1520(e).  Determination of RFC requires consideration of the evidence taken as a whole, including not only objective medical evidence, but also the subjective complaints

expressed by the claimant.  Polaski v. Heckler, 739 F.2d 1320, 1321-1322 (8th Cir. 1984).  In evaluating those subjective complaints, the ALJ must consider the objective medical evidence or its absence, along with prior work record and observations by third parties and treating and examining physicians.  Polaski, 739 F.2d at 1322.

The ALJ determined claimant has the residual functional capacity to perform light work, lifting up to twenty pounds occasionally, ten pounds frequently; standing and walking for six hours of an eight-hour day; work involving brief and superficial contact with coworkers, with no public contact, no close work, such as a human service technician, no supervisory roles, work which is not performed in a hostile or interpersonal conflictual environment, and work involving no high production goals.  (Tr. 20).

The ALJ considered Plaintiff's subjective complaints in accordance with Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (Tr. 20).  He found Plaintiff was not fully credible because there were significant inconsistencies in the record as a whole.  First, he noted the objective medical evidence and the claimant's course of treatment were not consistent with the severity of her allegations.  (Tr. 20).  She did not have significant treatment for headaches. There were no findings of cerebral damage or neurological deficits, and no more than moderate cognitive difficulties.

Although she had surgery on her right shoulder, she did not have neurological or sensory deficits, no joint abnormalities, only mild decreased range of motion, and symptoms of pain improved with use of a TENS unit.  (Tr. 20).  Similarly, she had surgery on her right knee in 1995, but on examination in 2002, she had full range of motion, no tenderness, no instability and only mild degenerative changes confirmed by X-ray.  (Tr. 20).  The ALJ concluded the claimant

had sporadic treatment, frequently related to claims for disability benefits, improvement with the use of a TENS unit, no referrals to a chronic pain clinic, and no need for prescription pain medication.  (Tr. 20).

With respect to carpal tunnel syndrome, the ALJ noted the claimant sporadically uses splints.  Objective findings only confirmed mild carpal tunnel syndrome, and there had been no recommendations for surgery.  (Tr. 20).  Although the record documents chronic sinusitis and obstructive pulmonary disease, tests confirmed only moderate respiratory deficits.  (Tr. 21).

The ALJ noted Plaintiff is impaired by depression, post traumatic stress disorder, and panic disorder with agoraphobia.  (Tr. 21).  He found the claimant only received sporadic counseling through August 23, 2004[4], and that she stabilized with use of psychotropic medications.

The ALJ considered the claimant's activities of daily living.   He found her to be fairly active in caring for her personal needs, cooking, doing dishes, light housework, gardening, using a computer, collecting, and seeing her family on a regular basis.  (Tr. 21).

Next, the ALJ considered the claimant's work history.  He noted the claimant had a fairly consistent record of work for the State of Minnesota since 1993, and she worked with a QRC to try to return to work.  (Tr. 21).  He noted, however, that her "subjective allegations" significantly restricted job placement, and she received long-term disability, workers' compensation, and filed multiple applications for disability insurance benefits.  (Tr. 21).  He found this to reflect a lack of "strong motivation" toward a return to the workplace.

---

[4]  The ALJ cites to Exhibit 45F which is a record of a consultative psychological examination on August 23, 2004.  Plaintiff's last appointment for individual therapy was in August 2003.  (Tr. 729-736).

The ALJ considered the various physicians' opinions in the record.  He gave significant weight to Dr. Gannon's opinion with respect to the claimant's physical impairments.  Dr. Gannon opined the claimant could perform light work, which the ALJ found to be consistent with the March 27, 2003 opinions of the state agency medical consultants and the weight of the record.  (Tr. 21).

The ALJ gave little weight to Dr. Stern's opinion of September 7, 2001 that the claimant should not be required to use her right shoulder at or above shoulder level.  (Tr. 22).  He found that, subsequent to the date of the opinion, the record did not indicate significant difficulties with range of motion, or neurological or sensory deficits to support such a restriction.  (Tr. 22).

The ALJ gave significant weight to the opinion of the neutral medical expert, Dr. Huber.  (Tr. 22).  The ALJ did not give significant weight to the opinions of the claimant's therapist, Ms. Heimsness, or the state agency psychological consultants, that the claimant was restricted to routine, repetitive, unskilled work.  He rejected these opinions because the claimant had average cognitive and memory abilities.

The ALJ rejected the opinions of Dr. Camenga, Dr. LaKosky, and Dr. Christensen that the claimant was not capable of gainful activity secondary to her physical and mental impairments.  (Tr. 22).  The ALJ stated:

> These opinions are clearly based on the claimant's allegations regarding the severity of her symptoms and functional limitations which are not well supported by the evidence of record.  As these opinions are not supported by clinical findings, laboratory diagnostic techniques, and are not consistent with other substantial evidence of record they are not being given controlling weight in this decision.

(Tr. 22).

At the fourth step of the evaluation process, the ALJ determined that Plaintiff cannot

perform her past relevant work.  20 C.F.R. § 404.1520(e).  (Tr. 23).  The ALJ considered that the claimant was fifty-three years old, an individual closely approaching advanced age, with a high school education.  (Tr. 23).  At the fifth step of the evaluation, the ALJ found there are jobs that exist in significant numbers in the national economy that claimant can perform including carver, salad maker, and pantry goods maker.  (Tr. 23.)  The ALJ found the vocational expert's testimony to be persuasive and consistent with the Dictionary of Occupational Titles.  Thus, the ALJ concluded the claimant is not under a disability as defined under the Social Security Act.  20 C.F.R. § 404.1520(g).  (Tr. 24).

### D.   <u>Standard of Review</u>

Judicial review of defendant's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Morse v. Shalala</u>, 32 F.3d 1228, 1229 (8th Cir. 1994).  Substantial evidence is enough evidence that a reasonable person might accept as adequate to support a conclusion. <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).  Where such evidence exists, a court is required to affirm defendant's factual findings.  <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001).  On the other hand, the analysis must include evidence in the record which detracts from the weight of the evidence supporting the ALJ's decision.  <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998).  Thus, the court must consider the weight of the evidence in the record and apply a balancing test to evidence which is contrary.  <u>Id.</u>

The Court is required to review the administrative record as a whole and to consider:  1) the credibility findings made by the ALJ; 2) the education, background, work history, and age of the plaintiff; 3) the medical evidence provided by treating and consulting physicians; 4) the

plaintiff's subjective complaints; 5) any corroboration of plaintiff's impairments by third parties; and 6) testimony of vocational experts based upon proper hypothetical questions setting forth plaintiff's impairments.  Cruse v. Bowen, 867 F.2d 1183 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

However, in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).

## VI.    DISCUSSION

Plaintiff contends the ALJ erred in a number of respects.  First, Plaintiff contends that the ALJ failed to reopen prior applications.  Second, Plaintiff argues the ALJ should have found her disabled because she met or equaled a listed impairment.  Third, Plaintiff contends the substantial medical record as a whole demonstrates disability.

Defendant asserts the ALJ's decision not to reopen prior applications cannot be reviewed. Defendant further asserts the ALJ appropriately weighed the evidence and explained his reasons for finding Plaintiff's impairments did not meet or equal a listed impairment.  Finally, Defendant argues the ALJ gave appropriate weight to the various physicians' opinions.

### A.    Reopening Prior Applications

Plaintiff contends the ALJ erred in ruling that a finding of good cause was required to reopen her prior applications for disability benefits.  Plaintiff was denied benefits on her first application.  Instead of appealing, she filed a second application on October 11, 2002.  The

second application was denied.  Instead of appealing, Plaintiff filed a third application in October 2003.  Each new application was filed less than one year after the most recent denial.

Plaintiff cites 20 C.F.R. § 404.988 for the proposition that a previous determination may be reopened for any reason within twelve months of the date of the notice of the determination. Plaintiff concludes, under this regulation, each of her prior applications was automatically reopened when she filed a new application within twelve months of the notice of denial. Plaintiff notes this is significant because it calls the ALJ's entire decision into question because he refused to consider evidence of disability prior to the third application.  Plaintiff recognizes the ALJ considered such evidence solely for the purpose of determining disability after the third onset date.

Defendant argues that reopening a prior application is a matter of the Commissioner's discretion and not a matter of right.  Furthermore, Defendant asserts the refusal to reopen a prior claim is not subject to judicial review.

A federal district court's jurisdiction to review the Commissioner's decision regarding disability benefits derives from 42 U.S.C. § 405(g).  The refusal to reopen an administratively final decision is not subject to judicial review because it is not a "final decision...made after a hearing" as defined in 42 U.S.C. § 405(g).  Boock v. Shalala, 48 F.3d 348, 351 (8th Cir. 1995). The decision to reopen is a matter committed to the Commissioner's discretion and may be decided without a hearing.  Id.  This Court does not have jurisdiction to review Plaintiff's claim that the ALJ erred by failing to reopen prior applications.

**B.  Listed Impairments**

Plaintiff contends that when Drs. Huber, Wagner, and Gannon's opinions are considered

together, substantial evidence demonstrates that Plaintiff's condition equals a mental health listed impairment.  Plaintiff notes Dr. Gannon was the only doctor who expressed an opinion combining all impairments, physical and mental, in determining whether Plaintiff met or equaled a listing.  Plaintiff asserts the ALJ erred in relying on the opinions of Drs. Huber and Wagner because they did not consider her physical impairments in combination with her mental impairments.

Defendant points out Plaintiff did not identify the particular listing that she believes her impairments met or equaled.  Defendant notes, for mental health impairments, a claimant must meet two of the paragraph B criteria at a markedly impaired level, but Plaintiff has not identified the B criteria under which she is markedly impaired.

Defendant admits that Dr. Gannon concluded Plaintiff's impairments equaled listing 12.06 Anxiety Related Disorders.  However, Defendant asserts such a finding is reserved to the Commissioner, and a physician's opinion on the issue is not entitled to any special weight.

Defendant further argues that the ALJ considered whether Plaintiff's impairments met or equaled a listed impairment, and his conclusion that they did not is supported by the opinion of the medical expert, Dr. Huber.  Defendant points out Dr. Huber testified that the record did not substantiate that Plaintiff had marked limitations for a continuous twelve months.  See Titus v. Sullivan, 4 F.3d 590, 595 (8th Cir. 1993)(defining duration requirement of disability as continuous inability to engage in substantial gainful activity for a period of twelve months).

Dr. Gannon opined Plaintiff equaled the listing for anxiety related disorders under 12.06 in combination with an organic mental disorder under 12.02.  (Tr. 874-75).  Dr. Gannon did not specifically address the severity level of Plaintiff's impairments under 20 C.F.R.§ 404, Subpt. P,

App. 1, § 12.06, paragraph B.  The paragraph B criteria for 12.02 and 12.06 is the same.  <u>See</u> 20 C.F.R.§ 404, Subpt. P, App. 1, §12.02 and §12.06.

After the ALJ determines Plaintiff has severe impairments, he must consider whether those impairments meet or equal a listed mental disorder by applying diagnostic and severity criteria.  20 C.F.R. § 404, Subpt. P, App. 1, §12.00; <u>Weickert v. Sullivan</u>, 977 F.2d 1249, 1251 (8th Cir. 1992).  The diagnostic criteria, called "paragraph A" criteria, require the ALJ to decide whether a claimant has "a medically determinable mental disorder specified in one of eight diagnostic categories defined in the regulations."  <u>Russell v. Sullivan</u>, 950 F.2d 542, 544 (8th Cir. 1991).  Then, the ALJ must measure the severity of the mental disorder, "paragraph B" criteria, in terms of a prescribed list of functional restrictions impacting the claimant's ability to work.  <u>Id.</u>

If there are multiple impairments, the ALJ must consider the combined effect of all impairments.  20 C.F.R. § 404.1526; <u>Weickert v. Sullivan</u>, 977 F.2d 1249, 1251 (8th Cir. 1992).  There are three ways to show medical equivalency.  20 C.F.R. § 404.1526.  First, medical equivalence can be shown where a person has an impairment described in Appendix 1, but does not exhibit one or more of the findings specified in the listing.  It can also be shown where a person exhibits all of the findings, but one or more findings are not as severe as specified in the listing.  Equivalence will be found where the claimant has other findings related to her impairments that are of equal medical significance to the required criteria.  20 C.F.R. § 404.1526(b)(1)(ii).

A second way to show equivalency to a listed impairment is by presenting medical findings equal in severity to all the criteria for the one most similar listed impairment.  <u>Marciniak</u>

v. Shalala, 49 F.3d 1350, 1353 (8th Cir. 1995); 20 C.F.R. § 404.1526( b)(2)(applies where a

claimant has an impairment that is not described in Appendix 1).   The third way to show

equivalency applies where a Plaintiff has a combination of impairments, none of which meets a

listing.   The SSA "will compare your findings with those for closely analogous listed

impairments.   If the findings related to your impairments are at least of equal medical

significance to those of a listed impairment, we will find that your combination of impairments is

medically equivalent to that listing."   20 C.F.R. § 404.1526(b)(3).

The parties dispute whether Plaintiff meets the severity level for disability under the

paragraph B criteria.   "The functional limitations in paragraph B and C must be the result of the

mental disorder described in the diagnostic description, that is manifested by the medical finding

in paragraph A."[5]   Subpart P, Appendix 1, § 12.00 Mental Disorders.

12.06 Anxiety Related Disorders provides:

> In these disorders anxiety is either the predominant disturbance or
> it is experienced if the individual attempts to master symptoms; for
> example, confronting the dreaded object or situation in a phobic
> disorder or resisting the obsessions or compulsions in obsessive
> compulsive disorders.
>
> The required level of severity for these disorders is met when the
> requirements in both A and B are satisfied, or when the
> requirements in both A and C are satisfied.

---

[5]   Plaintiff argues that her combination of physical and mental impairments meets or equals a listed impairment.   Plaintiff does not explain how the combination of mental and physical impairments would result in a finding of disability.   Plaintiff's contention that Dr. Gannon's opinion is based on consideration of her physical and mental impairments in combination is not accurate.   Dr. Gannon opined that Plaintiff equaled the listing for 12.06 when considered in combination with 12.02 organic mental disorders.   (Tr. 874-75).   There are no medical opinions in the record that a physical impairment(s), in combination with a mental impairment(s), equals any listed impairment.   Furthermore, Plaintiff has not identified how any physical and mental impairments in combination equal a specific listing.

A.  Medically documented findings of at least one of the
following:

1.  Generalized persistent anxiety accompanied by three out of four
of the following signs or symptoms:
       a.  Motor tension; or
       b.  Autonomic hyperactivity; or
       c.  Apprehensive expectation; or
       d.  Vigilance and scanning;
or
2.  A persistent irrational fear of a specific object, activity, or
situation which results in a compelling desire to avoid the dreaded
object, activity, or situation; or
3.  Recurrent severe panic attacks manifested by a sudden
unpredictable onset of intense apprehension, fear, terror and sense
of impending doom occurring on the average of at least once a
week; or
4.  Recurrent obsessions or compulsions which are a source of
marked distress; or
5.  Recurrent and intrusive recollections of a traumatic experience,
which are a source of marked distress;
AND
B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or pace;
or
4.  Repeated episodes of decompensation, each of extended duration.
OR
C.  Resulting in complete inability to function independently outside the
area of one's home.

Dr. Huber rated two of the paragraph B criteria as moderately to markedly impaired.  (Tr.

957).  The ALJ recognized if Plaintiff were markedly impaired in two of the paragraph B

criteria, she would meet or equal a listing.  Dr. Huber explained that he could not substantiate

from the record that Plaintiff was markedly impaired for a continuous twelve months.

The ALJ need not give any special deference to a physician's opinion in determining

medical equivalency.  <u>Jacobsen v. Shalala</u>, No. 93-4033, 1994 WL 525055, *2 (8th Cir. Aug. 17,

1994).  Medical equivalency is determined by medical evidence based on symptoms, signs, and laboratory findings.  Id.

The ALJ found Plaintiff to have mild limitations in activities of daily living, moderate limitations in social functioning, concentration, persistence and pace, and no episodes of decompensation. (Tr. 19).  He made this determination considering variations in severity level over time.  (Tr. 19).

The ALJ supported his decision concerning Plaintiff's daily activities on the basis that she was able to live alone, cares for her personal hygiene, does light housework, and goes shopping.  (Tr. 18).  He noted that Plaintiff alleged some difficulties with activities of daily living but discounted this because "these resulted from physical not mental limitations."  (Tr. 18).

Additional evidence supports the ALJ's decision.  Although there were periods of time where Plaintiff restricted her daily activities, for example she could not leave the house or drive alone, these were brief and sporadic episodes.  Furthermore, Plaintiff's responses on the Multidimensional Pain inventory indicated that her pain causes little emotional suffering and interferes little in her daily activities.  (Tr. 659).  Even when Plaintiff was admitted for partial hospitalization, the evaluation interview notes indicate "okay ADLS."  (Tr. 385).  The record is consistent with the ALJ's finding of only mild limitations.

The ALJ supported his decision concerning Plaintiff's limitations in social functioning on the basis that she related appropriately to all treating sources, interacted well in group therapy, maintained stable, close interpersonal relationships, and had no history of altercations, evictions, social isolation or fear of interpersonal relationships.  Although there is evidence in the record

that Plaintiff had difficulty getting along with a new supervisor, Plaintiff's own opinion is that she has no difficulty getting along with coworkers, supervisors, and the public.  (Tr. 655, 850).

There is some evidence in the record of Plaintiff engaging in social isolation.  (Tr. 385). However, there is no indication of a lengthy duration of social isolation.  The record indicates Plaintiff attended many doctor appointments, individual and group therapy, and frequently spent time with her family.  The evidence supports the ALJ's determination that Plaintiff would overall have only moderate limitations in social functioning.

The ALJ supported his decision concerning Plaintiff's limitations in concentration, persistence and pace on the basis that:

> ...psychological evaluations and cognitive testing have consistently confirmed that the claimant is fully oriented, with average memory, average intelligence, and the claimant was able to adequately focus and complete extensive psychological testing....Additionally, the claimant cared for two pet dogs, used a home computer, reported that she enjoyed collecting, and independently handled her own medications.

(Tr. 19).

The ALJ did not mention that Plaintiff's performance on immediate and delayed auditory tasks was below the level predicted for someone of her intellectual functioning.  (Tr. 658). However, Plaintiff's subjective complaints of memory loss are not related to auditory tasks.  She alleges she forgets where she is going, and has one to five minutes periods where she "blanks out."  (Tr. 653).  The results of her memory tests would not explain this phenomenon.[6]  Even if these symptoms are the result of an anxiety related disorder, as described in paragraph A of § 12.06, they were not frequent or severe enough to establish marked impairment.

---

[6] The record indicates Plaintiff's mother, who was living with Plaintiff, was diagnosed with dementia, and Plaintiff feared having dementia also.  (Tr. 653, 663-65).

The ALJ did not discuss the effect of Plaintiff's anxiety and panic attacks on her concentration, persistence and pace.  Certainly, anxiety at the level of a panic attack would cause marked limitations in concentration, persistence, and pace.  Although Plaintiff occasionally had anxiety symptoms which were severe enough to markedly impair her concentration, persistence, and pace (Tr. 272, 356, 495, 501, 682), the record overall does not support more than moderate limitations in concentration, persistence, and pace for any continuous twelve month period.  This is consistent with Dr. Lakosky's opinion of "a moderate emotional disturbance or 40% disability."  (Tr. 464).

The ALJ noted that Plaintiff had one episode of decompensation based on participation in a partial hospitalization.  He also noted that Plaintiff did not require inpatient psychiatric hospitalization or crisis center intervention.  (Tr. 19).  Plaintiff's episode of decompensation began April 9, 2001, and ended May 4, 2001.  (Tr. 371).  There is no evidence in the record to indicate Plaintiff had repeated episodes of decompensation, each of extended duration.  Therefore, substantial evidence supports the ALJ's decision that Plaintiff did not establish marked limitation in two of the four functional areas under the paragraph B criteria.  Thus, she did not meet or equal a listed mental health impairment.

### C.  Medical Opinions

Plaintiff submitted new evidence, a "Report on Continuation of Total and Permanent Disability" to the Appeals Council.  (Tr. 880).  The Appeals Council considered this evidence, but found it did not provide a basis for changing the ALJ's decision.  (Tr. 8-10).  The ALJ's decision became the final Agency decision.  Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).  Where the Appeals Council finds that new evidence does not contradict the ALJ's

34

decision and denies review, the reviewing court does not evaluate the Appeals Council's decision but instead determines whether the record as a whole, including the new evidence, supports the ALJ's determination.  Id.

Plaintiff contends the ALJ erred by failing to give due weight to the opinions of her treating physicians.  Plaintiff states:

> every doctor who had an opportunity to review all of the records (Dr. Huber and Dr. Gannon, and to some extent, Dr. Wagner) expressed an opinion that Ms. Anderson would have severe impairments on her ability to sustain work from a mental health perspective.  Moreover, the treating mental health doctors and the examining mental health doctor (Joan Heimsness, Dr. LaKosky, Dr. Christensen, Dr. Dewey, and Dr. Camenga) expressed opinions that Ms. Anderson was not capable of sustaining full time work.

(Plaintiff's Motion for Summary Judgment at 18).

Defendant argues the record supports the ALJ's decision concerning the opinions of Plaintiff's treating physicians, and the evidence submitted to the Appeals Council does not change the result.  Defendant notes the ALJ explained that he did not grant controlling weight to the opinions of Drs. Camenga, Lakosky, and Christensen because they are not supported by any objective findings and were inconsistent with other substantial evidence.  Defendant contends the ALJ properly requested the opinions of medical experts, Dr. Gannon and Dr. Huber, and appropriately relied on Dr. Gannon's opinion of Plaintiff's physical impairments and Dr. Huber's opinion of Plaintiff's mental impairments.

A treating physician's opinion is typically entitled to controlling weight if it is well-supported by "medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in the record."  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000); 20 C.F.R.

§ 404.1527(d)(2).

Dr. Christensen was Plaintiff's primary care physician.  He opined that Plaintiff was disabled as of February 24, 2001.  He listed her diagnoses and symptoms as follows:  depression and anxiety with post traumatic stress disorder; myofascial trigger points with continuous headaches; and previous injury of the right shoulder with continued pain, limited range of motion, and weakness.  (Tr. 401).  In July 2001, Dr. Christensen opined Plaintiff "continues to be totally disabled because of post traumatic stress syndrome and disorder."  However, in November 2001, Dr. Christensen opined that Plaintiff "is perfectly able to do any lateral work that the state should be able to provide..." within certain restrictions.  (Tr. 479).  The work restrictions were "ten pounds lifting, no overheads, and no repetitives."  (Tr. 479).

Dr. Christensen spent a significant amount of time working with Plaintiff and her QRC to prepare Plaintiff to return to work.  He released her for work on a number of occasions.  This contradicts his opinion of disability.

Another factor to be considered is consistency of the opinion with the record as a whole. Plaintiff's condition was not static.  Both physically and mentally, she had periods of improvement and periods of decline.  The more specific issue in this case is whether a physician's opinion is consistent with evidence in the record of continuous disability for twelve months during the relevant time period.  Dr. Christensen's opinion is not.  In fact, review of the entire record indicates there was no sustained twelve month period where Plaintiff's symptoms continued without improvement.[7]

_____

[7] Plaintiff's treatment records, beginning in April 2000, one year before the alleged onset of disability, indicate periods of improvement and decline.  The following is a chronological review of the pertinent treatment notes in terms of improvement or worsening of physical and

Dr. Dewey is one of Plaintiff's primary care physicians, but he is not a mental health specialist.  Plaintiff treated with him from December 2002 through at least January 2004. (Tr. 761-76).  His opinion is inconsistent with the record for the same reasons as with Dr. Christensen.

Dr. Dewey opined that Plaintiff is totally and permanently disabled from any occupation. He explained that her disability was related to being attacked by a client in 1999, which led to chronic pain, fibromyalgia, post traumatic stress disorder, and panic disorder with a significant component of depression.  (Tr. 831-32).  He did not offer further support of his opinion.

Dr. Dewey completed a "Report on Continuation of Total and Permanent Disability" on March 27, 2006.  (Tr. 880).  This was submitted to the Appeals Council after the hearing before the ALJ.  Dr. Dewey opined Plaintiff continued to be disabled, and supported his opinion with

_____

mental impairments:  March 2000, very little pain, no complaints of mental impairments (Tr. 286); May 2000, right shoulder acromioplasty (Tr. 284); June 2000, pain (Tr. 280); July 2000, pain much better and noted to increase with stress (Tr. 278); August 2000, pain improving (Tr. 275); September 2000, pain better, first indication of panic and nightmares (Tr. 272); October 2000, pain and PTSD, scared of returning to work (Tr. 511); November 2000, feeling much better, given an office job (Tr. 361, 358); December 2000, continued improvement (Tr. 357); January-February 2001, doing better until panic attack at end of February, revealed difficulties with new supervisor (Tr. 356, 353, 499-02); March-May 2001, symptoms at their worst, seemed to be related to work issues, partial hospitalization.  (Tr. 494-95, 371-73, 384-87, ); July 2001, underwent various examinations for workers' comp. claim (Tr. 463-64, 434-41, 471-76); September-October, panic and headaches (Tr. 482, 484); November 2001, can do lateral work with some physical restrictions (Tr. 479); February 2002, doing quite well since last visit but had hiatal hernia and mild carpal tunnel (Tr. 477-78); April 2002, doing excellent (Tr. 796); October-November 2002, panic related to taking class and fear of returning to work, irritable bowel (Tr. 677, 682, 674, 689); January 2003, evaluated for cognitive issues, GAF 45 (Tr. 653-60); March 2003, improving after severe stress with mother and father-in-law (Tr. 773); June-July 2003, physical complaints (Tr. 766, 768-69); August 2003, emotionally stable, underwent neuropsychological exam (Tr. 731, 737-42); January 2004, reported IBS, exhaustion, pain but better when treated with Elavil (Tr. 761, 763); August 2004, consultative exam, GAF 48-52 (Tr. 847-52).

the statement: "unable to function in work environment due to previous head injury/assault and subsequent PTSD/Depression and R shoulder pain." Dr. Dewey's opinion is consistent with the *diagnoses* in the record but is inconsistent with substantial evidence in the record because it does not take into account the aggravating factors[8] or periods of improvement of Plaintiff's condition.

Plaintiff was evaluated by Dr. Lakosky, a mental health specialist, twice. In August 2001, he opined that: "[t]he PTSD is severe and would classify as a moderate emotional disturbance or 40% disability." (Tr. 464). He explained that Plaintiff's condition is disabling to the extent that she should not work in her previous occupation or any other occupation that might involve interacting with psychiatric or mentally retarded patients. He further stated: "I don't see her being able to work in the next year or so..." (Tr. 464).

Dr. Lakosky's opinion was that Plaintiff cannot do her previous work. His statement that he did not think she could work in the next year was little more than speculation. The record indicates that Plaintiff was doing quite well over the majority of the next year, from November 2001 through September 2002. See n. 7.

Dr. Lakosky reassessed Plaintiff in January 2004. (Tr. 826-27). He concluded Plaintiff remained disabled from any occupation. (Tr. 826). He explained: "She has had no improvement with her panic disorder or generalized anxiety disorder. Overall, I think the best full diagnosis would be a Posttraumatic Stress Disorder." (Tr. 826).

This opinion is inconsistent with the record. After suffering severe stress related to family issues, in March 2003, Plaintiff noted improvement while on Zoloft,. (Tr. 772). Ms.

---

[8] Plaintiff's symptoms were aggravated by family stressors, fear of returning to work in a group home, and with a supervisor with whom she had conflict. (Tr. 278, 500, 677, 773).

Heimsness reported Plaintiff was emotionally stable in August 2003. (Tr. 731). This is the last record of Plaintiff receiving individual therapy. At this time, Plaintiff's PTSD was in partial remission. (Tr. 731). The record indicates improvement in her mental health.

Dr. Camenga is a neurologist who evaluated Plaintiff for headaches and cognitive impairments. He saw Plaintiff twice. In a letter to Plaintiff's attorney, he stated: "...I do not think she would ever be able to work full-time without missing a significant amount of work due to pain, migraine headaches and post traumatic stress disorder." (Tr. 756). This opinion is not consistent with substantial evidence in the record because there were significant periods of time where Plaintiff was doing well physically and mentally. See n.7. Dr. Camenga's opinion is also inconsistent with the evidence that Plaintiff infrequently sought treatment for headaches. She did not take prescription pain medication. (Tr. 274, 284). Plaintiff noted that Ativan, a prescription medication for anxiety, often relieved her headaches. (Tr. 949).

Dr. Gannon is a state agency consultant who reviewed Plaintiff's medical records. He is a thoracic and cardiovascular surgeon, and not a mental health specialist. With respect to Plaintiff's physical impairments, he opined Plaintiff could do light work, but could not do work involving association with mentally or physically disabled persons. (Tr. 875). His opinion is inconsistent with Dr. Christensen's work restrictions from November 2001. (Tr. 479).

However, Dr. Gannon's opinion is consistent with the record as a whole. There are no objective findings to support the severity of Plaintiff's complaints of shoulder and knee pain. (Tr. 277, 366, 620, 565-68, 712, 720-21). Psychological tests indicated Plaintiff's profile is consistent with people who respond to tension with physical complaints, and tend to magnify the severity of physical problems. (Tr. 659). With the exception of a shoulder surgery and knee

39

surgery well before the alleged onset date, Plaintiff had only conservative treatment for pain, which was often effective.  (Tr. 290, 619, 620-21).  Under the circumstances, Dr. Christensen's work restrictions of "ten pounds lifting, no overheads, no repetitives" are inconsistent with the record.  Dr. Gannon's opinion provides substantial evidence to support the ALJ's findings of Plaintiff's physical ability to do light work.

Dr. Huber is a state agency consultant who reviewed Plaintiff's medical records and testified at the hearing.  He is a psychologist.  The social security regulations recognize state agency psychological consultants are highly qualified professionals who are also experts in social security disability evaluation.  20 C.F.R. § 404.1527(f)(2)(i).  An ALJ must consider a state agency consultant's findings as opinion evidence.  Id.

Dr. Huber testified that he does not believe Plaintiff meets or equals a listed mental disorder because sometimes Plaintiff is moderately impaired, and sometimes she is markedly impaired.  (Tr. 957).  He could not find, in the record, a period lasting at least twelve months where Plaintiff was markedly impaired.  (Tr. 957-58).

Dr. Huber's opinion is consistent with the record.  The record indicates Plaintiff had periods of improvement and periods of decline of her symptoms, ranging from mild limitations from her impairments to marked limitations from her impairments.  See n. 7.  Dr. Huber offered the only opinion which considered whether Plaintiff was totally disabled from all work for a continuous period of twelve months.  Substantial evidence in the record indicates that she was not.

The ALJ did not err in granting significant weight to Dr. Huber's opinion that Plaintiff could perform work restricted to brief and superficial contact with coworkers and supervisors, no

work with the general public, not in a supervisory role, no high production demand, and work that doesn't have interpersonal type stress.  (Tr. 958).  These restrictions compensate for Plaintiff's anxiety and depression, which is triggered by working with aggressive, unpredictable or confrontational people.

### D.  Hypothetical Question Posed to Vocational Expert

Although Plaintiff outlines only three challenges to the ALJ's decision, her third argument encompasses a challenge to the vocational expert's testimony.  Plaintiff alleges the ALJ failed to include, in the hypothetical question to the VE, Dr. Huber's testimony that Plaintiff would be limited to working with people she gets along with.  Plaintiff correctly points out that no one can control or predict the personalities of their coworkers.

The ALJ, in his residual functional capacity findings and in the hypothetical question posed to the vocational expert, stated that Plaintiff is limited to "work that was not performed in a hostile or interpersonal conflictual environment."  This is how the ALJ described Dr. Huber's testimony that Plaintiff would be limited to working "with people she gets along with."

A hypothetical question must set forth impairments supported by substantial evidence in the record and accepted as true, and "capture the 'concrete consequences' of those impairments." Hillier v. Social. Sec. Admin., 486 F.3d 359, 365 (8th Cir. 2007) quoting LaCroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006).  The ALJ's description of Plaintiff's need to work in an environment free from hostility and interpersonal conflict was an attempt to explain, in concrete terms, that Plaintiff suffers severe anxiety when working with aggressive disabled persons and confrontational supervisors.  The ALJ accepted Plaintiff's allegation of anxiety as true. Substantial evidence in the record indicates Plaintiff's anxiety was at it highest level when she

was faced with working with disabled persons who were aggressive, and when working with a supervisor who was confrontational.  Dr. Christensen felt Plaintiff could have returned to work but for the problems with her new supervisor.  (Tr. 500-502).

No one can guarantee an environment will be free from hostility and interpersonal conflict (or that a person will only work with "people she gets along with.")  However, the ALJ incorporated another limitation into the hypothetical question that provides for the consequences of Plaintiff's anxiety in the workplace.  The ALJ restricted Plaintiff from "close work such as human service technician" and limited Plaintiff to only brief and superficial contact with coworkers, no public contact, no supervisory roles, and no high production goals.  Therefore, the VE's testimony that there are other jobs Plaintiff can perform was based on a proper hypothetical question.  A vocational expert's testimony, based on a proper hypothetical question which includes all of the claimant's impairments as determined by the ALJ constitutes substantial evidence.  Cruze v. Chater, 85 F.3d 1320, 1326 (8th Cir. 1996).  Therefore, substantial evidence supports the ALJ's decision.  For this reason, Defendant's motion for summary judgment should be granted.

IT IS HEREBY RECOMMENDED THAT:

    1.  Plaintiff's Motion for Summary Judgment be denied; [Docket No. 10];

    2.  Defendant's Motion for Summary Judgment [Docket No. 18] be granted.


Dated: December 7, 2007               *s/ Franklin L. Noel*
                                           Franklin L. Noel
                                           United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **December 27, 2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.